IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

THE UNITED STATES OF AMERICA, )
 )
    Plaintiff, ) District Court
v. ) Case No.
 ) 19-10102
MATTHEW ALEXANDER III, )
 )
    Defendant. )

TRANSCRIPT OF PROCEEDINGS

On the 2nd day of August, 2019, came on to be heard proceedings in the above-entitled and numbered cause before the HONORABLE GWYNNE E. BIRZER, Magistrate Judge of the United States District Court for the District of Kansas, sitting in Wichita, commencing at 2:17 P.M. Proceedings recorded by machine shorthand. Transcript produced by computer-aided transcription.

APPEARANCES:

The plaintiff appeared by and through:
  Mr. Ryan C. McCarty
  U.S. Attorney's Office
  301 N. Main Street
  Suite #1200
  Wichita, Kansas  67202-4812

The defendant appeared by and through:
  Mr. Mitch E. Biebighauser
  Federal Public Defender's Office
  850 Epic Center
  301 North Main Street
  Wichita, Kansas 67202

I N D E X

                                                              PAGE


EXHIBITS
For the Defendant:
No. 1              Pretrial services report              32


REPORTER'S CERTIFICATE                                   59

8-2-19  USA v. ALEXANDER  No. 19-10102                    3

```
 1          THE COURT:  The court will call the matter of the
 2  United States v. Matthew Alexander III, and that's Case
 3  No. 19-10102.
 4          And who's appearing for Mr. Alexander?
 5          MR. MCCARTY:  Your Honor, Assistant United States
 6  Attorney Ryan McCarty appears on behalf of the
 7  Government.
 8          THE COURT:  Okay.  All right.
 9          MR. BIEBIGHAUSER:  May it please the Court,
10  Mr. Alexander appears in person, in custody, by and
11  through counsel Mitch Biebighauser, Assistant Federal
12  Defender.  Good afternoon, Judge.
13          THE COURT:  Good afternoon.  All right.  I presume
14  that Mr. Alexander had his Rule 5 hearing as well as
15  arraignment before Judge Gale previously and the matter
16  was set over today for detention.  Does that sound about
17  right?  Okay.
18          I have reviewed in this case the indictment that's
19  been filed.  I recognize the potential penalties that
20  Mr. Alexander could face if convicted of the felon in
21  possession of a firearm charge.  I reviewed the motion
22  for release that's been filed and, obviously, the bond --
23  the pretrial services report.
24          Is there anything else, counsel, that you feel
25  like I should look at in preparation for this hearing?
```

```
 1         MR. MCCARTY:  Your Honor, the Government would
 2  note that this is sort of a nonconventional way to
 3  proceed with a detention determination in as much as a
 4  motion for release was filed last night.  If we're going
 5  to proceed on the motion, as I suspect we will, as you've
 6  already reviewed it, we would ask for 14 days in which to
 7  respond pursuant to Local Rule 6.1(d).  In addition to
 8  which, as it's noted in the bond report, the father is
 9  not going to know when he's going to have a house for the
10  plan until August 5th, which is Monday.
11         THE COURT:  Uh-huh.
12         MR. MCCARTY:  So I think, given those two things,
13  it's appropriate in this case to continue the matter.
14         THE COURT:  All right.  Mr. Biebighauser, do you
15  have argument or do you have any comments with regard to
16  that?  That seems like a reasonable request.  Even I had
17  to pull my bootstraps up to review your motion, so do you
18  have any comments?
19         MR. BIEBIGHAUSER:  Yes, ma'am.  I appreciate you
20  pulling your bootstraps up and reviewing the motion,
21  Judge.  I do not believe the Government is entitled to a
22  continuance here.  Mr. Alexander has the right to a
23  detention hearing.  That was set for today.  A 14-day
24  continuance, I think, leaves him in custody when the
25  matter's present and we're prepared to go forward today.
```

1        Moreover, if we're going to continue it, one

2   issue -- one threshold issue is whether or not the

3   Government can proceed by proffer.  I hate to wait 14

4   days only to find out we need to wait longer to get the

5   Government's witnesses in place.  As a threshold matter,

6   I think there's no reason for a continuance.  As a

7   follow-up to that, if a continuance is going to be

8   granted, I'd ask the Court schedule it on a day the

9   Government can have witnesses here in case the Court so

10  rules that witnesses are required, as my motion requests.

11       THE COURT:  Okay.  Well, do you have additional

12  comment, Mr. McCarty?

13       MR. MCCARTY:  I will note it sets a dangerous

14  precedent, obviously, to file an eleventh-hour motion

15  that comprises upward of 30 pages.  I'd also note that

16  this exact motion was filed up in Topeka.  It's something

17  that's circulating around the Federal Public Defender's

18  Office, adding little facts specific to this case.  I

19  think it's wasting the Court's time, it's certainly

20  wasting our time, and I think it's an abuse in this case.

21  I do think that the 14 days is adequate and called for

22  under the local rules, and that's what we'll be

23  requesting.

24       THE COURT:  Okay.  I recognize, Mr. Biebighauser,

25  that, you know, that you're entitled -- that

```
 1  Mr. Alexander would be entitled to a hearing, and I
 2  certainly want to give him one.  But that just seems like
 3  a punch in the jaw to do this at the eleventh hour when
 4  you know that motions like this are circulating
 5  throughout the District of Kansas and you could have
 6  filed this, you know --
 7        MR. BIEBIGHAUSER:  Judge, I was appointed
 8  Wednesday.
 9        THE COURT:  Okay.  Then you could have filed it
10  Thursday, you know.  I mean --
11        MR. BIEBIGHAUSER:  I did.  I don't mean to argue.
12  I did.  It's Friday.  I was appointed Wednesday.
13        THE COURT:  Okay.
14        MR. BIEBIGHAUSER:  There's --
15        THE COURT:  You're right.
16        MR. BIEBIGHAUSER:  -- 48 hours.
17        THE COURT:  You're right.
18        MR. BIEBIGHAUSER:  I really don't intend to file
19  motions at the eleventh hour and that upsets me that I
20  might get -- I've been appointed to this case 48 hours
21  and I filed it the day after I was appointed.
22        THE COURT:  Well, you should be commended for
23  that, okay.  I recognize that.  But to not give the
24  Government time to respond to a 29-page motion, to me
25  that just -- you know, that just -- that just doesn't
```

 1  fare well.  So maybe not the 14 days, Mr. McCarty, since

 2  you're used to -- since you know that these motions are

 3  around like this, but I'll give you some time.

 4        MR. MCCARTY:  Thank you, Your Honor.

 5        THE COURT:  Probably not 14 days because every day

 6  that Mr. Alexander sits in custody there is the potential

 7  that he could be released, then, you know --

 8        MR. MCCARTY:  Thank you.

 9        THE COURT:  -- it just makes sense.  So

10  August 5th, is -- from me reviewing the bond report -- it

11  appears that August 5th is the time that his father will

12  know where he's going to live.  I mean, is that a

13  consideration that -- you brought it up.  I --

14        MR. MCCARTY:  It was in the bond report.  I think

15  that's the soonest he would know about new housing, so we

16  would ask maybe that Wednesday or Friday of next week.

17        THE COURT:  Okay.  All right.  So today is --

18  we're in August already.  Okay.

19        So I would imagine your preference would be

20  Wednesday, Mr. Biebighauser?  I just think -- you know, I

21  just think, even on my own motion, just because of the

22  brevity of the motion, I think the Government should have

23  the opportunity to respond to your motion.  Even though

24  I've read it, I'd like to even, you know, look at it just

25  a little bit more, just to be honest, and so I just -- I

1   think that I'm going to give them the additional time.

2          So, Mr. Alexander, you know, I -- you know, I

3   mean, I can understand that that doesn't -- it's not what

4   you particularly wanted to hear, but just -- we just have

5   to be fair, you know.  And to not -- to file this last

6   night and expect it to be argued today, that just

7   doesn't -- that doesn't ring fair to me.

8          I want to be fair to you, but, unfortunately, that

9   means -- you know, to give them additional time, that

10  means that you'd have to be detained until we could get

11  you in front of the court.  I'll do it as soon as

12  possible.  I think Wednesday is fair to do that.  I was

13  looking at the bond report.  I don't see that you are

14  employed; right?  So it doesn't -- you know, I mean --

15          MR. BIEBIGHAUSER:  He is, Judge, employed.

16          THE COURT:  Okay.  He was employed with the --

17  okay, so this is City Cuts & Clean Cars?

18          MR. BIEBIGHAUSER:  Yes, ma'am.

19          THE COURT:  Okay.  And so you've been there.

20          Let me take -- let me think about it.  I'm going

21  to take a recess.  Let me put this at the heal of the

22  docket and let me think this through because I just need

23  to think about it some more.  Okay.  So let me just think

24  about it.  All right?

25          (A recess was taken from 2:24 to 2:41 P.M.)

```
 1        COURTROOM DEPUTY:  All rise.  Court is now in

 2   session.  Please be seated.

 3        THE COURT:  Just looking at the circumstances,

 4   here, I'm going to give the Government time to file

 5   their -- to file a response if you so desire.  You know,

 6   just given the fact that, you know -- and, you know, I

 7   guess, Mr. Biebighauser, I was still in July for some

 8   reason, you know, in terms of when you -- I was thinking

 9   last week.  But, you know, considering the fact that, you

10   know, I can appreciate you've been -- you were recently

11   appointed on Wednesday, but, you know, the motion was

12   filed after 5:00, you know.  As a practical matter it --

13   you know, the Government may not have even gotten a

14   chance to look at it until this morning, even though they

15   know that these motions are, you know, kind of

16   circulating around, I just think it's fundamentally fair.

17   I had to balance, you know, Mr. Alexander's right under

18   the Bail Reform Act, you know, that affords him the right

19   to a hearing within a specified number of days.  But,

20   again, you know, just against -- you know, just giving

21   the Government a fair opportunity to respond.  And I just

22   think that it's important, given the fact that the motion

23   was filed, you know, after work, you know, even.

24        And so, you know, Mr. Alexander, again, I know

25   this isn't what you wanted to hear, but I just -- I just
```

1   think, you know, I need to hear all sides, and so I'm

2   going to set this matter over for Wednesday.

3          MR. BIEBIGHAUSER:  Judge, if I may.

4          THE COURT:  You may.

5          MR. BIEBIGHAUSER:  I'm sorry.  I don't mean to be

6   stubborn on this but I just wanted to address something

7   on that.  First, I appreciate you recognizing -- I want

8   to be clear.  I had no intention of sandbagging anybody.

9   These things all happen very fast, so I appreciate the

10  Court's deference to time.  However, Mr. Alexander's

11  prepared to move forward today.  The motion, I don't

12  think, sets forth anything novel and they're all

13  arguments I could make orally if that's -- if we were

14  just to go forward today.  I can just make all these

15  arguments and I'm prepared to do that.  So in that case I

16  think Mr. Alexander's better off if I just withdraw the

17  motion and I can make these arguments orally.

18         THE COURT:  Okay.  If you want to withdraw the

19  motion, you know, I mean, that's -- that's up to you.

20  But, you know, if you want to proceed on this written

21  motion and, you know, prior to our break we talked about

22  folks getting witnesses here and that sort of thing -- I

23  mean, I want him to be able to evaluate whether or not he

24  really thinks he should do that.  And so if you -- but if

25  you want to proceed orally, I mean, that's up to you.

1  But if we proceed as written, like this, I'm going to

2  give him time.

3       MR. BIEBIGHAUSER:  And I think that's something

4  worth addressing.  If we were to schedule for Wednesday,

5  it would be nice if we knew whether or not the Government

6  could have witnesses here, in case the Court's ruling is

7  that witnesses are required, in fact, I'd like to go

8  forward on that day.  Does that make sense?

9       THE COURT:  It does.  But, I mean, you know,

10  you're asking them to break their legs and, you know, you

11  filed an eleventh-hour motion, you know.  I mean, this is

12  getting to be too much.  But, I mean, I can appreciate

13  that.  I can.  So I'm going to say if you want to proceed

14  on the motion, I'm going to set it over for August 7th.

15  That'll be -- and that will be -- or do you want a

16  special setting?  'Cause it looks like if you're going

17  to -- you're thinking that you -- are you going to call

18  any witnesses?

19       MR. BIEBIGHAUSER:  Judge, I'll proceed by proffer.

20  The statute allows the defense to proceed by proffer.

21       THE COURT:  But my question is are you going to --

22       MR. BIEBIGHAUSER:  No, I don't intend to.

23       THE COURT:  And the Government is certainly not

24  required to proceed by witnesses, but I want you to

25  evaluate that.  And just in the interest of time, you

1  know, if you could let me know if you want a special

2  setting I'll give you a special setting.  If you, you

3  know, you think we can go alongside the regular docket,

4  put it at the heel, then I'm willing to do that too.

5      MR. MCCARTY:  I will just say, Your Honor, that

6  the arresting officer in this case is out next week, is

7  my understanding.

8      THE COURT:  How about the next week?

9      MR. MCCARTY:  And you're out the next week, and so

10  we probably wouldn't be calling any witnesses.

11      THE COURT:  Okay.

12      MR. MCCARTY:  I don't think it would behoove us to

13  call the case agent, who doesn't have any direct

14  knowledge of the case but only put it together for our

15  purposes.

16      If Mr. Biebighauser wants to proceed today,

17  withdrawing the motion, we would be fine with that,

18  certainly -- I certainly read the file and understand the

19  elements at play here so the Government's fine with that

20  if that's what the defense wants to do.

21      THE COURT:  What's your pleasure,

22  Mr. Biebighauser?

23      MR. BIEBIGHAUSER:  Well, Judge, if I withdraw the

24  motion, I'd still like to make the arguments contained in

25  the motion.  Are you --

1          THE COURT:  That's fine.

2          MR. BIEBIGHAUSER:  Okay.

3          THE COURT:  I'm not going to handicap you at all.

4   I mean, I think Mr. -- you know, Mr. McCarty can handle

5   that, you know.  I mean, he's familiar with this sort of

6   thing.  But you filed a written motion --

7          MR. BIEBIGHAUSER:  I see, okay.

8          THE COURT:  -- and so that's a different deal.  So

9   if you want to proceed, and if you want to, you know,

10  summarize and make the arguments, whatever arguments you

11  want to make, if you withdraw the motion, we can go.

12         MR. BIEBIGHAUSER:  Oh, okay.  I don't mean to

13  overcomplicate it.  We'll just withdraw the motion and

14  I'll use it as a guide to make argument.

15         THE COURT:  All righty.  So what is the

16  Government's position with regard to detention?

17         MR. MCCARTY:  Your Honor, the Government believes

18  that the defendant is both a danger to the community and

19  a flight risk under 18 United States Code 3142(f)(2) and

20  is therefore asking that the defendant be detained.  I'm

21  happy to proffer at your convenience.

22         THE COURT:  All right.  Proffer is fine.

23         MR. MCCARTY:  Thank you, Your Honor.

24         MR. BIEBIGHAUSER:  Judge, since I've withdrawn the

25  motion, I'll make an oral objection.  I appreciate that

1   it sounds like the Court will overrule that objection.

2       MR. MCCARTY:  Okay.  Thank you.  First, I would

3   just say, having read the bond report in this case, the

4   Government's not impressed with the release plan in this

5   case other than he wants to live with his dad and his dad

6   is looking to find new housing to be determined next

7   week.

8       Other than that, that hasn't stopped him from

9   committing crimes before.  The Government's also not

10  persuaded by actuarial data that's -- well, is not

11  persuaded by actuarial data or statistics that it has

12  been told in the past it cannot rely on itself, so I

13  don't think those are points to rely on in this case.

14      I will say, just looking at the factors we're

15  supposed to look at, it doesn't take much more than

16  reviewing the nature of the present offense and his

17  criminal history that he's certainly a danger.  And in

18  this case, which is captured on Axon, the defendant was

19  pulled over during a routine traffic stop.  He was known

20  to the arresting officer as someone involved in gang

21  activity and otherwise violent to police officers.  It

22  was therefore that he was patted down and sat on the

23  curb.  Unfortunately, that pat down didn't initially

24  upturn the firearm that was in the defendant's pocket.

25  It was only after -- partway through the detention that

1  they saw that there was a bulge in his pocket, and the --

2  what was found was a firearm that was fully loaded, with

3  one in the chamber.  Fortunately, this didn't end in

4  tragic circumstances, but it could have.

5       Looking at his criminal history, Your Honor,

6  certainly there's a history of violence and a history of

7  the use of firearms.  For purposes of the record, I'll

8  just say that, going as far back as an arrest on

9  January 4th, 2010, we see criminal threat, felony

10  aggravated battery, felony.  Going on down, aggravated

11  battery, arrested on 10-20, 2011, possession of a firearm

12  by a felon.  So that's eight years ago, Your Honor.  He's

13  still dealing in firearms.

14       All his interactions with the court hasn't kept

15  him from keeping firearms on his person.  You can see

16  there that he had to be arrested three more times for

17  probation violations and was, therefore, deemed a violent

18  offender.

19       Continuing on, we see that in March of 2015 --

20  though it was dismissed, we don't know why -- he was

21  charged with criminal discharge of a firearm at an

22  occupied vehicle, possession of a firearm by a felon, and

23  the aggravated assault with a deadly weapon.

24       Not too much time later, in the same year, July of

25  the same year, we see criminal discharge of a firearm at

1  an occupied dwelling, criminal possession of a firearm,

2  criminal threat, battery.  Again, violent offender.

3       We see that same year, two days later, promotion

4  of the sale of sexual relations and to induce another to

5  sell sex.

6       Going on to September 2015, you see a violation of

7  a protection order.  Down a little bit further on that

8  same page, violation of offender registration act felony,

9  miscellaneous misdemeanor batteries, et cetera, in there,

10  and then there's this present charge.  And that's just

11  his history of violence.

12       Let's go ahead and look at his history of flight

13  or not cooperating with the courts.  Let's just say

14  number one, ran from placement; number two, ran from

15  placement; number three, ran from placement.  Turning to

16  the second page, we have a revocation of his probation.

17  He wasn't able to behave while out.  We see, on the next

18  page, failure to appear.  That's 3-10 of 2015.  7-15 of

19  2015, absconded.  7-27, 2015, absconded.  12-4 of 2017,

20  probation violation, revoked.  12-4, 2017, probation

21  violation, revoked.

22       And here we are at this present case and we see

23  that here he is again with a gun, something he's been

24  dealing with on and off with the law for over eight

25  years.  He hasn't learned his lesson.

```
1        There's no reason for this court to believe that
2   he's not going to continue carrying a gun.  There's no
3   reason for this court to believe that he's going to heed
4   any of your orders.  And in sum, Your Honor, there's no
5   condition or combination of conditions that will
6   reasonably assure either that the community is safe with
7   this gentleman out or that he will return to court as
8   requested.  It is, therefore, that we are asking for
9   detention in this matter.  Thank you.
10        THE COURT:  Thank you.
11        Mr. Biebighauser?
12        MR. BIEBIGHAUSER:  Thank you, Judge.
13        THE COURT:  So you've withdrawn your motion for
14   release, and so you're going to refer to some of the
15   arguments here.
16        MR. BIEBIGHAUSER:  Yes, ma'am.
17        THE COURT:  I'm not going to stop you from doing
18   that.  I just want to make sure that you know that.
19        MR. BIEBIGHAUSER:  Yes, I understand.  Thank you.
20   Loud and clear.
21        Judge, we're here for a hearing on the
22   Government's burden.  The burden in this case, the
23   Government must prove risk of flight by a preponderance
24   of the evidence and it must prove dangerous to any other
25   person based on clear and convincing evidence.  I'd
```

1  suggest to the Court take these under -- take these

2  burdens seriously, and they are necessary for both

3  societal interests and the interests of my client.

4      A detention hearing necessarily involves a

5  deprivation of liberty to somebody that has not yet had

6  any criminal conviction, at least in the present matter.

7  And because of its radical interference with somebody's

8  release, the condition of clear and convincing evidence

9  of dangerousness should be taken seriously.

10      Likewise, the preponderance of the evidence

11  standard is also there for a reason.  In this case, even

12  that would be a low standard, it's not toothless.  The

13  Court needs to be sure that the Government carries its

14  burden and it needs to make sure that the Government is

15  the one that carries that burden.  Here, as a threshold

16  matter, it appears there's no evidence of risk of flight

17  from the area.  Here Mr. Alexander has remained in

18  Wichita his entire life.  He's had similar residences his

19  entire life.  He's associated with his family here his

20  entire life.  Except for a couple years where he lived in

21  Florida and Colorado, his Wichita has been his home.

22  There's no reason to think otherwise.

23      The Court needs to address several statutory

24  factors here found at 3142(g).  I'd like to address each

25  of those factors, starting with a broad overview of

 1  Mr. Alexander's release plan because I think that couches

 2  what's going to happen if the Court grants the motion.

 3  So if the Court were to release Mr. Alexander, he would

 4  like to reside with his father.  If the Court has

 5  concerns about that, he could just go back to where he

 6  was living before, which is with his cousin.  He has

 7  places to live.  His preference is with his father at the

 8  time of the bond interview.  His father's in the process

 9  of moving.  He'd like to help his father move into that

10  residence.  It would be at Linwood Apartments.  I spoke

11  to him yesterday.  But if the Court's concerned about

12  that transition, he could live with his cousin where he's

13  been living for the past several months.  He thought it

14  might be more appropriate that he live with his father

15  because his cousin has children in the home and he was

16  worried about, you know, any caretaking responsibilities

17  that might be thrust upon him when he has to respond to

18  the court.  So he's going to live with his father for

19  that reason.

20         If the Court has pause, he has other options.

21  He's not homeless.  He has opportunities, and we can find

22  a satisfactory residence for him to live at.  He's

23  employed.  He'd remain employed, and his employer has

24  reaffirmed that he could return to work if he were

25  released.  So that's the plan, Judge.  He'd go back to

1 where he was living, or down the road with his father, if

2 that works out, and he'd go back to work.

3      So addressing the factors set forth at 3142(g).

4 The question for the Court, is there any conditions of

5 release that the court could impose.  But in reflecting

6 on whether or not it should impose those conditions, the

7 court should carefully reflect on the outcome of

8 detaining Mr. Alexander.

9      It's important for the Court to remember that this

10 decision has incredible influence on downstream

11 determinations, and it shouldn't be taken lightly.  It

12 has significant costs both to him and his family, his

13 future employment.

14      Statistics and case law is replete, as well as a

15 number of third-party sources, are replete with

16 information that it increases the chance of conviction,

17 it pressures people to plead guilty.  Studies have shown

18 that it increases the chance for a prison sentence by an

19 average of 332 percent, and an average of a lengthy

20 sentence by 236 percent.  And detention increases the

21 rate of recidivism, and I think that's intuitively clear.

22      We have the resources that we do in the federal

23 system.  Releasing somebody under the watchful, diligent,

24 and also guiding eye of the United States Probation

25 Office helps somebody transition back into society rather

1  than putting them into an intuition where they are in a

2  pressure-cooker situation with people that, for one

3  reason or another, have found themselves there.  We have

4  the resources as part of the federal government,

5  allocated money to supervise and also guide people.

6       It's not just about letting them go and seeing if

7  they succeed.  The probation office has resources to help

8  with that, and that's something that can avoid the costs

9  of increased guilty pleas but also reduce the rate of

10 recidivism.  And that goes hand in hand with reducing the

11 rate of whether or not Mr. Alexander will be a risk of

12 danger.  Because in these cases mentioned here, with no

13 disrespect to Sedgwick County, the state is just not

14 funded the way the federal Government is.  When they

15 supervise somebody, they don't supervise somebody the way

16 the federal government does.  This is different.  And so

17 the risk-of-flight calculation changes when you have

18 something so hands on as federal pretrial supervision.

19      The Bail Reform Act was intended to target only a

20 very small number of particularly dangerous folks.

21 Liberty, under the pretrial -- under the Bail Reform Act,

22 is the norm.  We're here to determine whether detention

23 is necessary, whether it's required.  It is the last step

24 in a multistep process.  First, can they just be released

25 at all.  And I appreciate conditions are necessary in

1    this case.  That's the second step.

2         Then there's temporary detention in certain cases.

3    And then there is detention.  It is a fallback position.

4    It is the last-case scenario, and reserved for cases

5    where there are no conditions that can assure

6    Mr. Alexander is not a danger to the community and not a

7    flight risk.

8         THE COURT:  But, Mr. Biebighauser, this is where

9    the rubber's going to meet the road and, you know, I

10   don't mean to -- 'cause your flow is good, you know,

11   because what condition could I possibly set that would

12   tell Mr. Alexander that he can't possess a gun?  He's

13   been to prison a couple of times.  You know, he's been

14   sentenced to prison a couple of times.  That didn't do

15   it.  You know, he got in trouble as a juvenile, you know,

16   and then as a young 18-year-old lad.  That didn't do it.

17        You know, what condition could I possibly set to

18   make him understand, if he doesn't understand it already,

19   that he should not be carrying a gun?  What condition?

20        MR. BIEBIGHAUSER:  Here's the condition, Judge.

21   That condition is the understanding, as I'm sure the

22   Court will advise Mr. Alexander, that committing a new

23   offense while on federal pretrial release will -- as easy

24   as these cases are to prove, would assure -- if he's

25   convicted -- would assure that he's going to go to prison

1  for a consecutive amount of time.  This isn't getting

2  probation anymore.  Possessing -- committing a new crime

3  and a firearm crime while on release is consecutive time.

4  That is something that Mr. Alexander has never faced

5  before, a federal consecutive sentence for many, many

6  years.

7       I don't have the statute number.  I believe it's

8  ten years.  I could be wrong.  I'd be happy to prove me

9  wrong.  Whatever it is, it's consecutive and it's severe.

10  That is a condition that's never been imposed on him in

11  the past.  That is something that would assure the Court

12  that he gets the message now.  This is literally the last

13  straw if he wants to get out before he's 35 years old,

14  Judge.

15       So I think that condition is the condition the

16  Court can impose.  And it doesn't have to do anything.

17  That's just automatic.  That's what the statute says.  So

18  I think that's the condition.

19       But also, I would temper the Court's concern

20  that -- I appreciate his record.  But on federal release,

21  the statistics are different, and those are the ones that

22  bear out here.  The probation office has put these

23  statistics together.  They're not made up.  They're not

24  taken in a vacuum.  They consider all kinds of things.

25  And so the concern about future crime, what conditions

1    can we possibly impose, needs to be tempered by will

2    those conditions be violated, do I need to impose

3    conditions.  And here's why I bring that up, Judge.

4    There are a number of things that the PTRA score

5    includes.  And that's what I'm getting to, I know the

6    Court's aware of.  It considers a number of things that

7    the Court is considering anyway.  It's considering things

8    like foreknowledge of the charges.  This charge is a June

9    offense, and Mr. Alexander's been in custody since that

10   time.  He knows what's going on.  He was advised he was

11   getting charged.  He got WOP'd in the state but he knew

12   this was out there, so he had foreknowledge of the

13   charge.  It considers that.  It considers whether there's

14   a lack of meaningful ties to other jurisdictions.  He's

15   been in Wichita for 20 years, so that's considered.  It

16   considers whether there's inability to travel abroad.  He

17   has no passport.  He's never done that.  It considers

18   whether he is employed.  He is employed.  He has a high

19   school diploma and he's certified to do better, more

20   particular work, and he could exercise that.  It

21   considers whether the presence of third-party influences.

22   There are, both his father, who I've spoken to, and his

23   girlfriend, who's sitting here in the courtroom, Judge.

24   It considers that.  It considers his amenability to

25   electronic monitoring, which the -- as far as I can tell,

1  has not been imposed by a prior court, something he would

2  agree to and, frankly, Judge, would match up perfectly

3  with what I imagine will be a dual imposition of

4  circumstances.

5      The -- Mr. Alexander's currently on supervision.

6  He was revoked but then reinstated based on this same

7  offense.  He was arrested in this case a couple days

8  before his bond -- or before he was arrested in the state

9  case, he was then revoked and then reinstated on new

10  conditions.  So he's in the community per the state

11  judge.

12      Let me get back to my point, which is he already

13  has a curfew of 9:00 to 5:00, and so electronic

14  monitoring is easy.  He already has 9:00 to 5:00.  That's

15  more -- I haven't been doing this very long.  I think

16  that's more conservative than a typical curfew that's

17  been imposed because we have allowances for work and we

18  have all these kinds of different things and 5:00 o'clock

19  is primarily for an adult.

20      I'm sorry, I'm reading this backwards.  His curfew

21  is from 9:00 P.M. to 5:00 A.M.  I'm reading that

22  backwards.

23      THE COURT:  I know what you meant.

24      MR. BIEBIGHAUSER:  So we can construe that

25  narrowly, Judge, so that his amenability of electronic

1  monitoring is also strong, and PTRA includes that as

2  well.

3        So to answer your question, there's two points.

4  To recap, first the imposition of a consecutive federal

5  sentence is itself really a condition.  I mean, that's --

6  that should, just frankly, strike fear into

7  Mr. Alexander's heart.  He will not see his kid grow up

8  if he commits a new offense.  He will not be there to

9  support his girlfriend.  He will not be there to support

10  his father, who needs his assistance.  He will lose out

11  on his young adult life.  That is the stakes.

12        So in terms of a condition, that's your condition.

13  But then in terms of whether or not we need to go above

14  and beyond, when it comes to federal supervision, because

15  the stakes are different and also because the programming

16  is different and because the resources are different, the

17  statistics should at least assist in driving that

18  decision because the statistics consider the same thing

19  that you and I, Judge -- and I don't mean to put myself

20  in your shoes because it's something I don't have to do,

21  and I don't envy that.  But when we look at the

22  statistics about when this is happening, when these fears

23  that we have bear fruit, people in PTRA category four

24  commit offenses where there is an arrest at all only 13

25  percent of the time.  Only 13 percent of the time.  So

1   our fears aren't necessarily bearing fruit, Judge.

2        If you look at -- if you look at people in PTRA

3   category four there is only -- really, there's less than

4   a 30 percent chance statistically of any adverse event

5   whatsoever.  Arrests for an offense while on release is

6   13 percent, Judge.  And that's something that shouldn't

7   be taken lightly.

8        You have -- you absolutely have a role, and I do

9   not mean to take that away from you at all you because

10  it's one you have to carefully consider.  But there's

11  also something to be said for can our fears trump

12  reality.  And sometime they can.  Because your point is

13  well taken:  what do we do for the future?  I appreciate

14  that.  But we have -- we only know the future in a

15  predictive sense.  We don't know Mr. Alexander's future.

16  But we do know the future of people at large when they're

17  released.

18       Arrests involving violent cases are 2 percent.

19  And if firearm cases are going to be lumped into those --

20  I should find the answer to those, whether they include

21  firearm offenses in that.  I would bet not.  Violent

22  offenses are only 2 percent of the time.  We don't know

23  Mr. Alexander's future, but we can look back on what the

24  future was for these folks, and that's the only way we

25  can look at the future.  There's no in -- there's no

1    personal way to do that.

2         And I should say, too, these aren't my statistics,

3    Judge.  I don't come in here with some junk science.

4    These are statistics developed by the United States

5    Probation Office.  They're sitting right here on my

6    table.  The court put them on my table.  I didn't make

7    these up.  And so to ignore them or to suggest that

8    they're a waste of time or an abuse of the motion process

9    to raise them should be disregarded.  These statistics

10   need to be taken seriously because -- and I'll try not to

11   repeat myself again, this is the last time I'll do it --

12   because we can't predict something in an individual

13   sense; we can only predict something by and large, in an

14   overarching sense.  And so I think it's important to

15   reframe the way we assess our fears.  The way the motion

16   that I've now withdrawn sets out doing that is again by

17   looking at the statistics and determine whether at large

18   a person with these factors would offend or would have an

19   adverse incident.

20        The statistics for that are low.  The Court's role

21   isn't diminished by that.  As I point out in the motion,

22   which has now been withdrawn so I'll recite, the term for

23   that is what's called the "broken-leg problem."  The

24   broken-leg problem is the idea that every once in awhile

25   there's a factor that can't be considered.  For example,

1   the broken-leg problem is, well, people go to the movies

2   every Friday night, but if they break their leg on

3   Thursday they're not going to the movie on Friday night,

4   so that's the broken-leg problem.  There's something that

5   has happened that a statistic can't account for.

6          The factors that I listed earlier, the

7   Mr. Alexander's employment, the amenability to

8   supervision, the lack of meaningful ties elsewhere, his

9   inability to travel, all of those things are considered.

10  And so we're looking for something in this -- including

11  his criminal history, that's what PTRA's all about.  So

12  those things, because they're already considered, those

13  aren't broken legs; those are things that we can predict

14  in a societal sense, and so I think we need to reflect

15  and do that.

16         I've now, I think, gone way afield of the Court's

17  question but I'd like to return to the factors.  But if

18  you want to interrupt me, I hope you do, I'd much rather

19  address your questions than ramble on about things I'm

20  only guessing are important.  Are there other questions

21  before I go back to this factor?

22         THE COURT:  Not at this -- not at this stage.

23         MR. BIEBIGHAUSER:  All right.  So going back to

24  the factor, I want to talk about the nature and

25  circumstances of this offense because it's different than

1  typical.

2        Judge, on -- when this offense occurred, just

3  hours before it, just hours before this offense occurred,

4  Mr. Alexander was called by his aunt.  His aunt was

5  terrified and she was scared.  She has her own troubles

6  with the criminal justice system, and she was concerned

7  about a family member, her son, my client's cousin.  The

8  cousin was in an apartment and he had just found his

9  father had committed suicide.  He was -- the cousin was

10 hysterical, and he was using controlled substances.  The

11 aunt, who had called my client, told my client how scared

12 she was, how concerned she was, and that there's a

13 firearm in the apartment, if there is anything he could

14 do, she asked him to do it.

15       He left home.  He left work, actually.  He arrived

16 at the apartment, and he tried to figure out something he

17 could do.  His cousin was high, his cousin hadn't been

18 eating, and his cousin was hysterical.  So he took the

19 firearm, because there was nothing else to do because

20 leaving it there was dangerous, and he drove to Hardees

21 to get something to eat.  So Hardees?  Hardees, to get

22 something to eat.  He pulled in the drive-thru.  He was

23 stopped for failure to use a signal.  I think the officer

24 recognized him, frankly, and spoke with him and realized

25 he couldn't be driving, conducted the search.

1       Mr. Alexander was cooperative.  The firearm was in

2   his pocket.  There's no deception.  There's no throwing

3   it in the woods.  There's no hiding it in the center

4   console.  There's no furtive movements.  He had a mission

5   that day.

6       Those facts are different than any other firearms

7   case that I've ever encountered.  And I haven't been

8   doing this long enough where I could say "in my 30

9   years," but in my short five years, I can say I've never

10  encountered a case like that.  That doesn't make you

11  innocent.  But we're not here to determine whether or not

12  he's innocent or guilty of the crime.  We're here to

13  determine whether he's a danger or a flight risk.

14      Over the past six months leading up to this, while

15  he's been on probation, he's been checking in every month

16  with his probation officer.  The pretrial services report

17  explains that they spoke with his pretrial services

18  officer in the state system.  He's checking in every

19  month.  He's submitting urinalysis tests.

20      If I can approach, I have copies of those and I'll

21  provide them to the Government.  May I?

22      THE COURT:  You may.

23      MR. BIEBIGHAUSER:  Judge, he was negative and not

24  diluted in December of 2018.  He was negative and not --

25  I didn't mark these, Judge.  I'm sorry.  I'll take 'em

1 back and mark 'em, if it's necessary, but I'd move to --

2      THE COURT:  I can see April, May, and June he was

3 negative.

4      MR. BIEBIGHAUSER:  Yeah, all negative and all

5 dilutes.  I'd offer Defense Exhibit 1 for purposes of

6 this hearing.

7      THE COURT:  Any objection?

8      MR. MCCARTY:  No.

9      MR. BIEBIGHAUSER:  Thank you.

10      THE COURT:  1 will be admitted.

11      MR. BIEBIGHAUSER:  Negative.

12      So, Judge, these months lead up to that moment.

13 And so this is somebody when his aunt called him, he was

14 sober, he was clear-headed, and he was a family resource,

15 somebody that his family counted on.

16      His aunt would not have done that if she believed

17 that Mr. Alexander was a danger, because she was tasking

18 him with going into a very dangerous situation, one that

19 could easily be escalated.  She didn't call anybody.  She

20 called Mr. Alexander.

21      And so the nature and circumstances of this

22 offense weigh in favor of release because this isn't

23 somebody gangbanging in a car.  This isn't somebody

24 driving down the street with a gun they know they

25 shouldn't have.  This is somebody that had tried to do

1  the right thing, had no other options.  It's not an

2  excuse.  It doesn't make him innocent, but it makes him

3  rational, it makes him doing what he thought was right.

4  He may have consequences for that, but his cousin did not

5  kill himself, and that was the goal.  And so the nature

6  and circumstances of the offense are different and should

7  be contextualized.

8       The second factor the Court can consider.  I've

9  heard many times this court say, "I appreciate that

10  you're innocent until proven guilty," or that you have

11  the burden of proof in your favor, and I appreciate that

12  deference, but I think that misses the mark because we're

13  not here about whether it's beyond reasonable doubt or

14  that standard gets preserved.  The weight of the evidence

15  is about the weight of the evidence of whether he's a

16  danger or a flight risk.

17       And so we're not here about whether he's guilty or

18  not.  And so reasonable doubt, we're not even -- we're

19  not there yet.  What we're here about is the weight of

20  the evidence for whether he's a danger to the community

21  or a flight risk.  And the Government has not proffered

22  or presented evidence that he's a danger to the community

23  or a flight risk.  He's remained in Wichita.  Despite his

24  failures to appear, he's returned to the court.  He

25  hasn't fled the jurisdiction.  This is a federal

1  jurisdiction.   He's never left here.

2       And so, Judge, the weight of the evidence, I

3  think, needs to be recalculated.  I addressed that in my

4  motion, which I've withdrawn.  But we need to avoid this

5  rabbit hole of sentence first by detaining somebody

6  because we appreciate they're innocent until they're

7  proven guilty, but the gun was in his pocket, which is

8  this case.  Those facts are bad for him at trial.  I

9  appreciate that.  But that's not what we're here about.

10 And so we need to avoid the rabbit hole of deciding

11 whether or not the weight of the evidence is about

12 whether he's guilty because that's not the standard.

13 What we're here for is the terms of whether or not it

14 bears on his risk of nonappearance and his risk of

15 harming the community.

16      This offense doesn't do those things.  This is a

17 status offense.  I appreciate his prior offense, and

18 that's difficult to swallow, but we're not here because a

19 firearm was used in addition to a robbery, in addition to

20 a burglary, in addition to a drug crime.  We're here

21 because this is -- he allegedly possessed the firearm.

22      So our question then is whether or not that

23 offense makes him a danger to the community.  Our entire

24 state is free to possess firearms.  The entire -- I

25 should say the entire district is free to possess

1  firearms.  People that are convicted of prior crimes are

2  permitted to possess firearms in Kansas.  That's the

3  society we live in.  They have to be a certain number of

4  years old, but people of all stripes are lawfully allowed

5  to possess firearms.  That doesn't make them dangerous to

6  the community.

7        This community, my personal feelings aside,

8  perhaps the Court's feelings aside, has decided

9  otherwise, has decided that it's okay to possess

10  firearms.  Now, it's still unlawful in his case.  But my

11  point is, considering our community norms about

12  possessing firearms, it doesn't make him more dangerous

13  than somebody else merely possessing the firearm.

14        Again, if this had been a pound of meth next to

15  him, if this had been burglar's tools in the back seat,

16  if this had been those things, perhaps -- if this had

17  been a crime -- if it had been those things, Judge, it

18  may be different.  Here we have a possession of a firearm

19  in the barest of senses, that is purely because of his

20  status he had a firearm, not that he was using it,

21  brandishing it or otherwise.  And if the Government could

22  have charged those things, I'm sure it would have, but it

23  didn't because that's not this case.  And so that's the

24  weight of the evidence we're talking about here, and the

25  weight of the evidence in regards to his risk of flight

1  or danger to the community is not strong.

2      So I'd like then to turn to the third thing for

3  the Court to consider, and that's the nature and

4  circumstances of Mr. Alexander.  I previewed this

5  earlier.  Mr. Alexander has a high school diploma.  He's

6  employed.  He can return to work.  He has a stable

7  family, a stable girlfriend of many years, a stable

8  father, a stable mother who he's in contact with, a

9  cousin who supports him who he's been living with for the

10 past months up until now and he could return to if the

11 Court's not -- if the Court's concerned about his father.

12 He has a child.  He has a number of family resources,

13 stable family resources.  He's been participating in

14 community service at the American food bank for the last

15 few weeks.  And he can do better.

16      He has a brick-laying degree and he could -- I'm

17 sorry, a brick-laying certification.  He could get into

18 that work.  He can better himself if he's released.

19 That -- talk about the adverse consequences of detention,

20 that certificate could expire if he's detained.  He won't

21 have the chance to renew it, to continue work.  He'll

22 lose the opportunity to provide for his family now.

23      If he's found guilty, if he works out a plea

24 agreement, he'll lose that down the road, but he doesn't

25 have to lose it now.  He can support his child now.  He

1   can save money now if he's released.

2        So there is more to him than just these failures

3   to appear.  He has other things happening in his life.

4   He's remaining sober.  Over the past six months while

5   he's been on supervision, he's reported as he should.

6   And so he's --

7        THE COURT:  I can --

8        MR. BIEBIGHAUSER:  -- accomplishing those things.

9   Go ahead.

10        THE COURT:  You know, it baffles me, with all this

11   good, I mean, I want to pay attention to the good and

12   positive things in Mr. Alexander's life because there are

13   some.  But, you know, we have to take, as you know,

14   history collectively and, I mean, he's got some stuff,

15   you know, in his criminal history which, you know, maybe

16   you're conveniently overlooking and maybe you're going to

17   get to it but, I mean, we've got things that look

18   dangerous, you know.  We've got criminal discharge of a

19   firearm.  I mean, the charges mirror, you know, between

20   March and July.  I mean, and even though it's 2015, it's

21   still history.  And so, you know, probably WOP'd him and

22   then, you know, they came back up, and then we've got the

23   other charge at 21.

24        I mean, the things that are sticking with him are

25   violent offenses.  You know, we've got a domestic battery

1  of a third or a subsequent.  I mean, what -- you know,

2  these are things that I can't ignore.  I mean, I

3  understand that there's some good things about him, and I

4  don't want to, you know -- I don't want to ignore those.

5  But at the same time I have to consider for the

6  community, you know, why is he out rolling with a loaded

7  gun.  And I just -- I quite -- it's difficult for me to

8  get over that.  I mean, I understand your explanation.  I

9  believe you.  But responsible use of a gun is it wouldn't

10  be loaded and it wouldn't be -- you know, it wouldn't be

11  a bullet in the chamber.  I mean, I just I'm struggling

12  with this.  So keep talking, but I'm -- that's where I'm

13  struggling.

14      MR. BIEBIGHAUSER:  All right.  Let me address that

15  criminal history.  What I want to come back to on his

16  criminal history is that that's something that's

17  contemplated already by the statistics that I cited, but

18  even more so.  When it becomes -- we're here to determine

19  whether there are any conditions at all, because the

20  statute requires no conditions.  So if that's our

21  starting place, let's decide if there are some.

22      If we're worried about his danger to the

23  community, one person that I think the Court may be

24  concerned that he's dangerous to would be the person

25  involved in this offense.  We can identify that person,

1   and the court can order a no-contact order.  We can order

2   a no-contact order within a certain number of feet.  We

3   can order a no-contact order within a certain number of

4   feet of their residence, within an area -- place of their

5   work.  Those are easy to set and easy to determine.

6        He's going to be on GPS monitoring.  It takes

7   about two seconds to cross-reference his GPS location

8   with the location of that individual's workplace or that

9   individual's home.

10        If there are other -- and so that's a condition

11   that could be imposed and one that could be easily -- one

12   that really already is monitored by GPS monitoring, and

13   so when it comes to those offenses, I think there are

14   some conditions that can be imposed and that's all that's

15   required by the statute.  So I think that covers the

16   dangerousness prong.

17        Secondly, I would suggest that that doesn't assist

18   the court in determining whether or not there is a

19   failure to appear.  Even considering the criminal history

20   such as has been reported, the danger to the community is

21   the -- the Government's not met that burden, even

22   considering --

23        THE COURT:  I don't find Mr. Alexander to be a

24   flight risk --

25        MR. BIEBIGHAUSER:  Okay.

1        THE COURT:  -- or that -- I think even if he ran,

2   he couldn't hide.  I just don't -- I think that he would

3   appear in court, so you can just save it.  You know, I

4   just don't -- I think he'd appear in court.

5        MR. BIEBIGHAUSER:  That will save me some breath.

6        THE COURT:  That's not my problem.  My problem is

7   the danger factor.

8        MR. BIEBIGHAUSER:  All right.  So let me go to

9   danger.  Even danger -- even people in PTRA category five

10  successfully complete pretrial release 77.5 percent of

11  the time.  That means no new violations because every

12  violation is a violation.  So that means if we're

13  predicting this at all, there is a three-quarters percent

14  chance, a bettor's chance, that that will not happen,

15  77.5 percent of the time they complete.  That means no

16  new battery charges.  That means no new possession of a

17  firearm.  That means no nothing, period, 77.5 percent of

18  the time.  That includes cases involving possession of

19  firearms.  There's cases on that that I could cite, the

20  District of Massachusetts case, *United States v. Lepere*,

21  *United States v. Ridinger* is a Western District of

22  Missouri case, and that also includes state holds, so

23  that will lead me to believe somebody that has a state

24  hold, that means they've got a prior case; right?  So in

25  both of those situations, even accounting for those

1  things, there is a 77.5 percent chance for people in PTRA

2  category five that they will commit no new violations.

3  And so that would, I hope, help allay the Court's fear

4  about the future because we can't predict Mr. Alexander's

5  future but we can look statistically at a body of people

6  similarly situated, and that's what we're able to do with

7  statistics, and they're probation office statistics.

8      If he's violent with anybody, some -- he'll be

9  arrested.  Somebody will call the police.  That will

10  happen.  The fact that that would go unknown is

11  exceedingly unlikely.  So we can look at arrests for any

12  offenses whatsoever in PTRA category four, like I said

13  earlier, is 13 percent.  13 percent.  And so the idea

14  that there's no conditions that can be set to get us that

15  low, I think, is a fear that we can allay.

16      THE COURT:  Mr. McCarty.

17      MR. MCCARTY:  Yes, Your Honor.

18      THE COURT:  Thank you.  Thank you,

19  Mr. Biebighauser.

20      MR. MCCARTY:  I'm going to try to proffer for just

21  a minute longer than Mr. Biebighauser.  I don't know if I

22  can, but there's a lot to unpack.

23      First of all, a lot of policy arguments are given

24  in this case, and I think it's up to you, Your Honor.

25  We've certainly been instructed by the district court

1  that we're not supposed to rely on the Pretrial Risk

2  Assessment tools.  One reason is because we don't know

3  how they were compiled.  There's not a witness up there

4  that can be subject to the *Daubert* determinations.

5          What is more, in this case --

6          THE COURT:  It's funny because when these -- you

7  know, when the court -- when we started giving these, the

8  arguments were opposite.

9          MR. MCCARTY:  Right.

10         THE COURT:  Okay.

11         MR. BIEBIGHAUSER:  Were either of us here then?

12         MR. MCCARTY:  So even if we do use these, let's

13 just assume that pretrial services uses them.  Well,

14 they're not recommending he get out.  So they know the

15 same statistics, arguably better than Mitch or myself,

16 and they're saying no, he shouldn't get out.

17         We agree with pretrial, that he is a flight risk

18 and a danger.  And when it comes to the time when he

19 doesn't show up -- and I guarantee you he will not show

20 up -- it's going to be these marshals that are going to

21 have to go get him, and they're going to be wondering is

22 he going to have a gun on him.

23         Let's turn to the nature of the present offense.

24 I failed to mention initially that he had K2 in his car.

25 Drugs.  You know, he had a gun and drugs.  We didn't

1  charge the K2, but he had drugs in his car.

2       He sat on the curb without alerting the officers

3  to the fact that they'd missed the gun during the pat

4  down.  That doesn't seem like somebody who is very

5  forthcoming and saying, "Officers, wait, look, I just had

6  to get this from my cousin.  Here it is.  I want to let

7  you know."

8       I've seen many cases where, as soon as officers

9  approach, they let the officer know, "Hey, I've got a gun

10  in my car.  I want to let you know I have a gun in my

11  car."  He didn't do that.  He sat there until they

12  happened to look over and see the bulge and go retrieve

13  the gun.

14       Fortunately no one was hurt.  That's not someone

15  who was forthcoming to officers, and you've got to think

16  about these marshals when they go out to pick him up in

17  this case worrying about that.

18       The defense policy note would have this court

19  believe that the barrier to detention is insurmountable,

20  almost like beyond a reasonable doubt.  It's not that

21  high.  The statistics that he cites bear out that it's

22  not that high 'cause a lot of people are detained, and,

23  frankly, in this case, given the fact that he had a gun,

24  after so many gun offenses, not just possession offenses

25  but firing guns into dwellings, firing guns into cars,

1   it's not somebody that the community, frankly, wants out.

2       I disagree -- willing to be shown but I disagree

3   that weight of the evidence goes to flight or

4   dangerousness.  From a logical perspective, that would

5   make number two completely redundant 'cause we're talking

6   about those things in the other factors.

7       In this case, the weight of the evidence, it's

8   important in this case because it's how likely is it that

9   he's going to be convicted.  It was found on his person,

10  Your Honor.  It's found on his person, and it's on Axon

11  video.  He's going to be convicted and he's going to go

12  away for a long time.

13      See, the reason that bears on number two and it

14  doesn't go to flight or dangerousness is because you need

15  to have the solace of knowing that he's going to go away.

16  And a little time before trial is not -- is going to be

17  credited to him.

18      On another policy argument, since we're talking

19  policy, it's convenient that they want the individual out

20  on bond and then the defense attorney controls the trial

21  docket.  We're not asked, downstairs or upstairs, when we

22  want the trial to be set.  Judge Melgren doesn't even let

23  the Government ask for continuances.  Everything is up to

24  them.  So they can prolong a trial for a year, all the

25  while he's out.  That's, from a policy perspective,

1   something suspect.

2       Moving along, I want to talk about --

3       THE COURT:  What time did this offense allegedly

4   occur?  What time?

5       MR. MCCARTY:  All I know it was during the day.

6   I've seen the --

7       THE COURT:  Okay.

8       MR. MCCARTY:  -- video, Your Honor.

9       THE COURT:  Okay.

10      MR. BIEBIGHAUSER:  11:00 A.M., Judge.

11      MR. MCCARTY:  That seems about right.

12      Addressing the assertion that he's been clean.

13  Fine, I'm not arguing that he's not -- that he's a

14  drug -- a druggie, although he did have K2.  He's a

15  violent person.  This isn't a drug offense.  I don't care

16  that he's been clean; he's a violent person.

17      Moving on to the fact -- to the story that we were

18  told.  You and I don't have any basis to believe or

19  disbelieve that.  It's just a story at this point.  It's

20  not subject to cross-examination.  We've never heard it

21  before today, conveniently.  He didn't try to explain

22  that to the officers at the scene.  We're learning about

23  it for the first time to explain why you should let him

24  out.  I don't think much weight at all should be given to

25  that.

1           Now, very briefly I will go through the elements,

2    since it was asserted that I didn't do that initially or

3    proffer any sort of evidence.  So looking at number one,

4    the nature and circumstances of the offense, a gun

5    offense, with K2 in the car, sitting on the curb, not

6    alerting the officers that he had a loaded gun on his

7    person.

8           Prior -- the weight of the evidence.  Again, I

9    think that goes to the weight of the evidence in the

10   case.  Otherwise that would be redundant.  And the weight

11   of the evidence is overwhelmingly strong.  Given his

12   criminal history, he's going to have a very high

13   guideline range, so it's looking like he will go to

14   prison longer than for any time that he would otherwise

15   be credited between now and trial.

16          History and characteristics of the defendant.

17   Frankly, he's not a good character, at least on paper.

18   That's all we have to go by.  I don't know him

19   personally, but I can tell by reading the bond report and

20   by looking at his criminal history he's shown lapse after

21   lapse after lapse, and again another lapse.

22          Physical and mental condition.  Perhaps he has

23   none.

24          Family ties.  I understand he has some family.

25          Employment.  Two months he's had a job, a seasonal

1  job for two months.  Grass-cutting season's coming to an

2  end.

3          Financial resources.  I don't think he has any.

4          Length of residence in the community.  Sure, he's

5  been in Wichita for a while, committing crimes.

6          Past conduct.  We've already discussed that.

7  We're not claiming that he has a big history of drug or

8  alcohol abuse, although he had K2 in his car.

9          Overwhelming criminal history.  He has not

10  shown -- again, as Mr. Metzger noted earlier, flight risk

11  is perhaps a misnomer.  He doesn't respond to court

12  directions.  You're going to ask that he come back or

13  he's going to be set for a trial, what have you, he's not

14  going to be coming back.  And these guys are going to

15  have to go retrieve him, and all they're going to know is

16  last time he had a gun on his person.  Okay?  He's had

17  numerous revocations on probation from the State, and

18  even some while other charges are pending.

19          Finally, nature and seriousness of any danger.

20  Well, in this case I think there was certainly danger to

21  the two officers that had pulled him over, as evidenced

22  on the Axon video, and that that could have been ended up

23  much differently.

24          Going back, lastly, I'll wrap up here, you asked

25  the right question:  what condition can you possibly set?

1  Well, what defense counsel gave you is not a condition;

2  that's just a statutory reality.  There's nothing you can

3  do.

4       Electronic monitoring, if he's going to hurt

5  somebody, if he's going to carry a gun, if he's going to

6  get into another altercation, what are they going to do?

7  They're not a police force.  Even if he has an electronic

8  monitoring, so they might know generally where he is.

9  They're not going to be able to stop any sort of crime or

10  violence in the community, and they're not going to be

11  able to assure his appearance at court.

12       And it is, therefore, that we would ask -- I

13  debated mentioning this, but because it is in the

14  evidence I will go ahead.  He talks about it, and then

15  I've corroborated, there was a homicide of which he's a

16  suspect in a homicide.  I grant you it's early in the

17  investigation, but it's something that's on the Axon

18  video, and Mitch will have a chance to review it and ask

19  questions about it.  And given that little fact as well,

20  he's just not a good candidate for release in this case.

21  So we would adopt the position of pretrial services and

22  request he stay detained.

23       THE COURT:  Mr. Biebighauser.

24       MR. BIEBIGHAUSER:  At the risk of losing my voice,

25  thank you, Judge.  The idea that that we would come up

1  with this PTRA score and then just disregard it is

2  strange to me, and I think it maybe -- maybe speaks for a

3  time.  We have statistics.  We have actuarials.  We have

4  ways to measure things but yet the Government asks us to

5  go with our gut, and that's not appropriate here where

6  we're predicting somebody's future because none of us

7  know.  All we can do is look at reality in the past to

8  try our best.

9       And the reality has to be looking at a larger

10  scheme because Mr. Alexander's never been on federal

11  supervision before.  Because the types of things that

12  we're imposing are going to be different, we have to

13  examine it in light of those facts.  And so the idea if

14  we measure all these things, that probation officer would

15  go to all this trouble, that the Court would put the

16  statistics on my desk and then we ignore them seems to be

17  indicative of the times that we're in, perhaps.

18       Regarding the new facts that the Government's now

19  brought up, the K2 in the car.  As I explained earlier,

20  his cousin was at the time hysterical, was high.  That's

21  where that came from.  And so it was there, that's part

22  of it, it's part of the story.  It doesn't make him

23  innocent but it goes to the nature and circumstances in a

24  way that is explainable more than just drugs and a gun in

25  a car.

1         His failure to disclose the gun.  I'll tread

2    lightly here.  But I would say perhaps when he's

3    pulled -- Mr. Alexander, given the person that he is,

4    being a black male, perhaps --

5         THE COURT:  In today's climate, I wouldn't

6    probably say that I had a gun either.  I understand that.

7         MR. BIEBIGHAUSER:  Okay.  I'll move on.

8         The Government's theme regarding the facts and

9    circumstances of the case and the weight of the evidence

10   was he's going to be convicted.  "Well, he's going to be

11   convicted anyway so let's detain him" is exactly the kind

12   of thing that this court is not to be doing.  We are not

13   thinking about what his sentence could be, whether he'll

14   go to jail, to determine whether or not to detain him.

15   That just needs to be excised from our thinking because

16   that's not the posture of the court now.  What we're

17   looking at are not whether he's going to be convicted.

18   Whether or not the case is a good one is not relevant

19   here.  The case, the facts of this case, do not

20   demonstrate dangerousness, as narrow as they are, looking

21   at them narrowly, does not demonstrate dangerousness.

22   They do not demonstrate a flight risk.

23        The Government argued "I can guarantee that he

24   won't show up."  The Court's already identified that's

25   not her concern here.  He lives in this community.

1  He'll be found.  He's not a flight risk.  And so their

2  guarantees and their thoughts of, "Well, he's going to be

3  convicted anyway," I'd just ask the Court to jettison

4  that kind of think -- that thought process.

5        Lastly -- maybe not lastly.  The idea that

6  "Everything is up to them," the idea that, "Well, if we

7  release him now he's going to drag the case out for a

8  year."  Everything is not up to Mr. Alexander.  Very few

9  things are up to Mr. Alexander.  He was indicted when the

10  Government wanted to indict him.  The Government's

11  already investigated this case, so got forbid he asks for

12  a continuance to do the same.

13        The Government can object any time it wants to a

14  continuance.  And I appreciate that they rarely do

15  because that's the way these cases need to be handled.

16  And I don't want to jeopardize that in the future, but

17  what I will say is very few things are up to the

18  defendant.  He can ask for a continuance.  If the Court

19  determines that that should not be granted, it won't be.

20  But continuances and dragging out the case is rarely, if

21  ever, a factor of whether or not somebody's performing on

22  pretrial release.  There's a whole different mechanism

23  for that.  And so the idea that the case could go on a

24  long time has nothing to do with whether or not we're

25  going to lose the power to supervise him or determine

1  whether he's in violation of his conditions.  And so

2  continuances are not really a factor either because those

3  aren't based on whether or not he's in -- he's violating

4  his conditions or not.

5       And so looking at the information that we have,

6  the reality that we have, in terms of statistics and

7  actuarial data, weighing that against the Government's

8  gut guarantees, weighing that against our fears, is

9  important.  This is a serious case, given his criminal

10  history.  I appreciate the Court's concerns.  But,

11  nevertheless, Mr. Alexander persists in arguing that

12  there is -- when it comes to federal supervision, the

13  question is different.  He's on probation already.  He

14  was doing well.  He had continued to do well until the

15  circumstances of this case as I've described them.

16       The Government explained that they don't doubt

17  them.  He wants to continue that behavior.  There are

18  conditions to impose that.  The last six months, under

19  lesser conditions, he was doing fine.  We can make them

20  more onerous, given what's happened.  He's been reimposed

21  in the state system.  Electronic monitoring, strict

22  curfews, and it is a de facto condition that if he gets

23  into more trouble he's going to prison for a long time.

24  And there's nothing he's going to be able to do about

25  that when it happens because that is a status offense

1  with a mandatory minimum.  And so whether it's a

2  condition or a statute, it's a distinction without a

3  difference.  He's subject to something he's never been

4  subject to before.  He gets that now.  And that's where

5  we are with Mr. Alexander, Judge.  I have nothing else.

6        THE COURT:  Mr. McCarty?

7        MR. MCCARTY:  Just briefly, Your Honor, if I

8  might.  It escaped me that he was on parole, as

9  proffered.  I think that that would create a presumption

10 of detention in this case.

11       MR. BIEBIGHAUSER:  It doesn't.

12       MR. MCCARTY:  Yeah, I think it would, actually.

13 If the Court would humor itself and look at the factors

14 that were cited by Mr. Metzger, the -- I believe it's

15 (e)(1), I think there is a presumption in this case, the

16 fact that he was -- committed this while he was on

17 parole.

18       MR. BIEBIGHAUSER:  That doesn't -- that does not

19 create a presumption, Judge.  That's not how presumption

20 is determined.

21       MR. MCCARTY:  I would ask you to look at that.  I

22 certainly think -- unfortunately, Mr. Biebighauser has

23 not been able to reconcile for the Court and for me the

24 basic logic of number two.  He would have this court not

25 look at the evidence of the current case.  But if it's

1 asking me -- if the statute's asking me to look at the

2 weight of the evidence against the person, why would it

3 ask that if we've already gone through that in number

4 one, number three, and number four?  'Cause that's all I

5 could do for number two is what other evidence is there,

6 then go through those other factors.  He's mistaken on

7 that point.

8        We are looking at the facts in this case, and

9 that's why the Government, in each case, that's why you

10 inquire as to the facts, Your Honor, as you did today

11 with the Rizzo case because you understand the facts in

12 the case do matter.  And I can tell you that the facts in

13 this case are very strong.  And without overselling, we

14 do anticipate a conviction in this case and we think,

15 given that, and given all the other things we've talked

16 about -- frankly, as long as we talked one would think

17 it's a close case -- we don't think it's a close case,

18 Your Honor.  We think it's very clear that this

19 individual, given his history, should be detained.

20        THE COURT:  So, Mr. Alexander, you know, I'm not

21 sure that this is a difficult case, but the decision is

22 difficult here.  The last thing that I would ever want to

23 do is -- is throw you -- you know, throw you away, which

24 is essentially what your lawyer is arguing, is that, you

25 know, if I detain you, you know, you -- you'd lose all

1  these things, you know, your gainful -- I recognize that.

2  You know, I recognize that the stakes are high and the

3  cost of detention is high.  I recognize that, you know,

4  even if I were to consider, you know, the PTRA score, I

5  mean, I recognize 'em and I acknowledge 'em, you know,

6  but, Mr. Biebighauser, it's the threes that are really

7  the hard cases, you know.  The fours are not as difficult

8  as three.  And he, Mr. Alexander, I think, sits a four.

9        And even if I, you know, whether I consider that

10  or not, I just -- I cannot ignore the fact that he's got

11  a loaded gun and he's been told, you know, several times

12  not to.  The reason for the gun, you know, I'm not going

13  to disagree with that.  You know, I would go running to

14  my family, you know, come hell or high water.  You know,

15  I don't fault you for that.  I don't fault you for not

16  acknowledging to, in today's climate, to the authorities

17  that you have a gun.  I understand that that could go

18  either way, and I would not fault you for that.

19        But what I do fault you for is that you had a gun

20  and you were not supposed to have a gun.  You've got all

21  this.  You've got a high school diploma.  You've got --

22  you can go back to an employer.  You've got gainful

23  employment.  You've got a certification in brick-laying.

24  You've got a lady.  You got a baby.  And yet you have a

25  gun, a loaded gun, that you shouldn't have.  And, to me,

1  you know, with your -- with your history that, sadly, is

2  finally -- you know, just some things just finally catch

3  up with you, and I think this is that, Mr. Alexander, you

4  know.  Just you had a gun.  You know, you've been told

5  not to have a gun at least four times, yet you still

6  carry a loaded gun.  I think that you'd be difficult to

7  manage, you know, on supervision, even on federal

8  supervision.  You know, it -- my heart tells me that

9  you've turned a corner and you want to act right, you

10  know, you want to be, you know, the person that your

11  lawyer describes here.  My heart tells me that, but my

12  brain just can't get there.  I can't think of a condition

13  that I could possibly set that could make you understand,

14  if time in prison hasn't done it, being adjudicated

15  hasn't done it, a new baby hasn't done it, a girlfriend

16  hasn't done it, none of this stuff could stop you from

17  carrying a gun.

18      And I just think you need to -- you just -- you're

19  going to have to lay down and think about where you're

20  going to go from here.  I don't -- I don't think it's me

21  saving you from yourself 'cause only you can do that, but

22  I just -- I think that the nature of the case, you know,

23  driving around, you know, with a loaded gun.  But the

24  fact that you were assisting a family member, I'm going

25  to make that go in your favor for purposes of detention

1  because I don't have any reason to disbelieve that.

2      The weight of the case, whichever way we look at

3  it, Mr. Biebighauser, if we look at the weight of the

4  evidence in terms of the whole case and the weight of

5  whether or not we think that Mr. Alexander reflects a

6  danger to the community, I think it weighs in favor of

7  the Government for purposes of detention.

8      His history.  You know, stability is one thing,

9  but he had all of those things in June of 2019 when he

10 carried a gun.  And that is what disturbs me in this

11 whole situation.  And I just -- that was just a month

12 ago.  I just, I -- there's no condition that I could

13 possibly set that I believe -- I'm clearly convinced of

14 that -- that there is no condition that I could set that

15 could get through Mr. Alexander's head that he cannot

16 carry a gun.

17     He's going to have to be detained and think about

18 it as to whether or not what he's going to do.  I'm

19 sorry.  I understand the ramifications of what this means

20 with your son and you being in custody.  I -- I am.  This

21 is why this is difficult for me because I understand

22 that.  But you cannot carry a gun.  You cannot carry a

23 gun.  And this is the feds.  This isn't relaxed state

24 stuff.  You cannot -- you cannot carry a gun and have a

25 felony conviction until you're off -- you know, until

1  you've done what you have to do and you can again.  So

2  that -- my ruling is that you be detained until further

3  order of the court.

4       Anything else?

5       MR. MCCARTY:  Nothing, Your Honor.  Thank you.

6       THE COURT:  We're adjourned.

7       COURTROOM DEPUTY:  All rise.

8       (Whereupon, the proceedings were concluded at 3:44

9  P.M.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE


I certify that the foregoing is a correct transcript from the

record of proceedings in the above-entitled matter.



s/ Johanna L. Wilkinson
Johanna L. Wilkinson, CSR, CRR, RMR
United States Court Reporter